UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| WILEY M. SMITH | ) | |
| | ) | Civil No. 11-99-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| CITY OF CORBIN, KENTUCKY, | ) | **ORDER** |
| | ) | |
| WILLARD McBURNEY, in his Official | ) | |
| Capacity as Mayor of the City of Corbin, | ) | |
| | ) | |
| CITY OF CORBIN POLICE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| DAVID CAMPBELL, in his Official | ) | |
| Capacity as Police Chief of the Corbin | ) | |
| Police Department, | ) | |
| | ) | |
| RICK BAKER, in his Official Capacity as | ) | |
| Corbin Police Officer, and in his Individual | ) | |
| Capacity, | ) | |
| | ) | |
| COY WILSON, in his Official Capacity as | ) | |
| Corbin Police Officer, and in his Individual | ) | |
| Capacity, | ) | |
| | ) | |
| WHITLEY COUNTY, KENTUCKY, and | ) | |
| | ) | |
| KENNETH MOBLEY, Whitley County | ) | |
| Jailer in his Individual Capacity | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

42 U.S.C. § 1983 cases are typically full of convoluted facts, mistakes and missed

opportunities, and conflicting narratives.  This case has those in spades.

Wiley Smith's decision to become inebriated and drive his automobile resulted in his arrest on the evening of April 2, 2010.  Smith was detained, placed in confinement, and released on April 4.  On April 12, Smith was admitted to the Veterans Administration Hospital (VA) in Lexington, and after spending approximately the next fourteen months in a hospital, part of Smith's right leg was amputated.

In this suit, Smith alleges that his leg had to be amputated due to the unconstitutional circumstances surrounding his arrest, detention, and release.  Motions for summary judgment have been filed by all parties, and for the reasons set out below, Smith's motion will be DENIED, Whitley County and Kenneth Mobley's motion will be GRANTED, and the City of Corbin, William McBurney, City of Corbin Police Department, Rick Baker, and Coy Wilson's motion will be GRANTED IN PART and DENIED IN PART.

## I.

Rick Baker, City of Corbin Police Officer, performed a traffic stop on Wiley Smith on April 2, 2010 at 6:24 P.M. after receiving reports from witnesses that Smith was driving slowly and erratically. [R. 66-13.]  Baker stopped Smith and approached him as he sat in his car.  Baker smelled alcohol, heard slurred speech, and observed that Smith's eyes were blood shot. [*Id.*]  Baker instructed Smith that he was under arrest and requested that he walk back to Baker's police cruiser. [R. 85 at 9.]

The parties agree that after Smith walked to Baker's cruiser force was used on Smith, but they disagree about the extent of the force.  Smith reports that he was shot with a Taser twice, sprayed with pepper spray, and partially subdued through the use of physical force. [R. 66-2 at 5-6.]  Baker acknowledges using a Taser and physical force on Smith, but he did not mark the box

on the Physical Force Report indicating that he used OC Spray (commonly known as pepper spray). [R. 66-13 at 20.]  The Whitley County Emergency Medical Service (EMS) records, however, describe an orange substance on Smith's face with the explanation that they were "informed [Smith] has been pepper sprayed." [R. 66-16 at 3.]

At 6:57 P.M., EMS records display that an emergency vehicle was dispatched to the scene of Smith's traffic stop, arriving at 7:04. [R. 66-16 at 3.]  EMS responded to the scene after being notified by law enforcement that Smith was being uncooperative. [*Id.*]  On arrival, EMS found Smith lying face up in the road, legs spread, and with "no physical injury noted." [*Id.*]  At 7:19, the EMS transported Smith away from the scene of the arrest and shortly thereafter arrived at the Baptist Regional Medical Center (BRMC). [*Id.*]

The records from BRMC indicate that Smith was triaged in the emergency room at 7:24 [R. 66-9 at 13] and admitted to the hospital at 7:37. [*Id.* at 12.]  The reason for Smith's visit to the hospital is listed as "possible alcohol use," [*Id.* at 13] and after examination, four diagnoses were tendered: "obesity, DM [presumably diabetes mellitus], chronic back pain" were listed under the "primary diagnosis" heading and "ethanol intoxication" was identified as a "secondary diagnosis." [*Id.* at 16.]  Discharge instructions were distributed addressing each of those diagnoses.  [*Id.* at 26-30.]  At another location in the BRMC record, "chronic leg pain" is written but accompanied by no explanation. [*Id.* at 15.]  Also noteworthy, on the BRMC History and Physical Worksheet, [*Id.* at 16] the treating physician—Dr. Keith Clifton—appears to have marked that Smith had "[n]ormal gait and station." [*Id.*]  Smith was eventually discharged at 9:51 P.M. [*Id.* at 17, 26] with Baker signing on Smith's behalf as the recipient of Smith's

3

discharge instructions. [*Id.* at 28.]  Finally, on the Extended Nursing Notes, BRMC wrote that Smith was "transported to police car for transport to jail." [*Id*. at 17.]

The Corbin Police Computer Aided Dispatch (CAD) report supplies additional information about Baker and Smith's interaction. [R. 66-4.]  Baker is identified as Unit 403 on the CAD. [R. 66-1 at 4.]  In general, this report briefly describes an officer's activities at various times while he is on duty.  Baker's report indicates that he was at BRMC at 8:29 P.M.; that he traveled to the Whitley County Detention Center (WCDC) at 10:06 P.M. and arrived at 10:21. [R. 66-4 at 3.]  At 10:40, a facsimile was transmitted between BRMC and WCDC. [R. 66-9 at 7.] According to deposition testimony, this transmission was necessary because WCDC will not accept a previously hospitalized arrestee unless a doctor has signed the patient's release. [R. 66-11 at 2.]  Smith's release was only signed by a nurse. [R. 66-11 at 2.]  The fax included Dr. David Douglas's signature below a nurse's signature. [R. 66-9 at 7.]  In spite of the signed release, and due to reasons that are currently unclear, WCDC refused to accept Smith as an inmate, and at 11:16 P.M., Baker reported that he and Smith were traveling back to BRMC. [R. 66-4 at 3.]  Baker submitted another CAD entry at 11:28 explaining that he was "standing by at Exit 15." [*Id.*]

All parties agree that Baker and Smith left WCDC.  From that point until 12:23 A.M. on April 3, [R. 66-14 at 4] the time at which Smith was accepted by the WCDC, it is unclear what took place.[1]

---

[1] Baker wrote in his Physical Force Report that WCDC refused to accept Smith because he had high blood pressure. [R. 66-13 at 21.]  As a result, Baker left WCDC and eventually ended up at BRMC at 11:45 P.M. [R. 66-4 at 3.]  According to Baker's CAD report, Smith was "recleared" by BRMC at 12:00 A.M. on April 3rd. [*Id.*]  At 12:01, Baker made a CAD entry that stated: "blood pressure was 146 over 92, pulse 122, BRMC advised jail probably used too small

WCDC's records show that Smith was booked on April 3 at 12:23 A.M. [R. 66-14 at 6.] A report was printed at 12:46 A.M. which recorded responses to a series of medical questions. [*Id*. at 12-13.] The report indicates that Smith's response to the question, "Do you have any medical problems?," was "yes." [*Id*. at 12.] A comment following that answer listed three issues: "diabetic, high blood pressure, post dramatic [sic] stress syndrome." [*Id*.] Also on that report, the question was posed, "Are there any visible signs of trauma, pain, bleeding, or infection?" [*Id*.] The response to that question was "no." [*Id*.] Smith's signature is at the bottom of that document. [*Id*. at 13.]

Around 1:00 P.M. on April 3, Verna Halcomb, a nurse who worked on behalf of WCDC, examined Smith. [R. 66-14 at 7.] Halcomb was summoned to WCDC from her home to examine Smith so that he could be released and taken to the VA. [R. 74 at 42.] Halcomb testified that Smith believed he needed to go to the VA because of a broken leg or ankle. [*Id*. at 41.] Although Halcomb did not form an opinion about whether Smith had a broken bone, [R. 74

---

of a cuff." [R. 66-4 at 5.] Baker stated that Smith arrived at WCDC at 12:13. [*Id*.] Baker reported to CAD, "jail, success" at 12:21 [*Id*.].

Smith reported similarly in his deposition, though his recitation of the facts does not include an ambulance ride or an initial visit to the hospital. [R. 66-2 at 4-8.] Smith recalls going to the hospital only after being refused admission to the WCDC. [*Id*. at 8-9.] Smith reports that he had blood drawn at BRMC, but he was not admitted to the hospital. [*Id*.] Then, Smith and Baker left BRMC, returned to WCDC, and Smith was booked. [*Id*.] Smith indicates that Baker and a doctor at BRMC discussed a problem with Smith's leg and decided not to examine it so that Smith could be taken to jail. [*Id*.] Meanwhile, Smith's counsel posits a different theory: "it is conceivable, and one might say probable, that [Baker] just waited the matter out at Exit 15." [R. 93 at 4.]

Finally, Dr. Douglas was questioned about this matter. Douglas denied having any recollection of Smith visiting BRMC around 11:51 P.M. [R. 73 at 17.] Douglas stated that BRMC's standard procedure would entail making records of admission and discharge for a patient's visit, even if the visit simply entailed checking someone's vital signs. [*Id*. at 20-21.] No records were made of Smith's reported visit.

5

at 45-46] she noted on the Transfer In/Transfer Out Screening a "possible FX Rt ankle." [R. 66-14 at 7.] Halcomb stated that Smith told her that his leg was injured when "someone slammed it in a door." [R. 74 at 48.] Halcomb observed that both of Smith's legs and feet appeared to be swollen, but no open wounds or deformities were visible. [*Id*. at 45.] She also marked "yes" that Smith needed immediate medical attention and noted that his "family will transport to hospital." [*Id*.]

Smith was released on April 4 at 7:46 P.M. [R. 66-14 at 4.] On April 12, Smith visited the Emergency Room at the VA. [R. 80 at 22.] Smith relayed to the VA that he had been arrested the prior week, that while being loaded into a police cruiser a door was slammed on his leg several times, and that he delayed getting attention after release from jail because he could not obtain transportation and because he drank regularly and heavily and did not want to stop that practice. [*Id*. at 22-23.] A fracture was found in Smith's leg and April 14 surgery was conducted to correct the fracture. [*Id*. at 26.] Smith remained hospitalized at the VA for more than one year following the surgery, [R. 69 at 52] and on, May 27, 2011, part of Smith's leg was amputated. [*Id*. at 53-54.]

## II.

### A.

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a

6

verdict for the nonmoving party.'" *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325.  Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact.  It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Id.* (internal citations omitted).  Finally, the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact," and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).  In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255).  Ultimately, the proper inquiry is whether the state of the evidence is

such that a reasonable jury could return a verdict for the nonmoving party. *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008) (citing *Anderson*, 477 U.S. at 251-52).

**B.**

Before the Court addresses the substantive issues raised in the instant motions, it is useful to clarify the parties involved in this action.  The Defendants who were not previously dismissed are limited to the City of Corbin, Kentucky; Willard McBurney, in his official capacity as Mayor of Corbin; the City of Corbin Police Department; David Campbell, Police Chief, Corbin Police Department, in his official capacity; Rick Baker, Officer, Corbin Police Department, in his official and individual capacities; Coy Wilson, Officer, Corbin Police Department, in his official and individual capacities; Whitley County, Kentucky; and Kenneth Mobley, Jailer, Whitley County, in his individual capacity.  Additional paring of Defendants is now appropriate in light of the motions for summary judgment.

The charges brought against McBurney, Campbell, Baker, and Wilson in their official capacities, are functionally equivalent to charges against the City of Corbin: "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *see also Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 169 (Ky. 2003) (holding similarly for claims based on Kentucky law).  This is because a plaintiff seeking to "recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.*  This principle also applies to any claims brought against Corbin's Police Department. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  Thus, the City of Corbin is the true defendant, and all claims against McBurney and Campbell, in their official capacities, and the Corbin Police Department are

8

dismissed. *See Clark v. Kentucky*, 229 F. Supp. 2d 718, 721-22 (E.D. Ky. 2002) (dismissing official capacity claims).

Mobley pled qualified immunity as an affirmative defense in his answer. [R. 112 at 4.] Supreme Court precedent explains that a government official can only be personally liable if he "caused the deprivation of a right." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Otherwise stated, "[b]ecause § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). Mobley explained that he did not learn about Smith or any matters relating to his confinement and care until after Smith was released. [*See* R. 67-1 at 26-27; R. 88 at 84-85.] Smith did not offer any evidence refuting Mobley's claim. [R. 94 at 9-10.] Accordingly, the Court recognizes that Mobley is entitled to qualified immunity for any federal claims brought against him in his individual capacity.

## C.

There are six claims on which the Court must rule: (1) use of excessive force, (2) deliberate indifference to serious medical needs, (3) failure to train, (4) assault and battery, (5) intentional infliction of emotional distress, and (6) negligence.

## 1.

Smith asserts his excessive force claim against Baker and Wilson. [R. 108 at 8-10.] Specifically, Smith complains that a Taser was used improperly against him and his leg was broken and ankle was dislocated as a result of Baker and Wilson's actions. [*Id.*] Baker and Wilson defend against Smith's claim by arguing that they did not violate Smith's constitutional rights, and therefore qualified immunity shields them from liability. [R. 66-1 at 21-22, 25-28.]

When invoked, "the doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In evaluating claims of qualified immunity, courts generally apply a two-step analysis. First, "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the right at issue was "clearly established." *Id.* "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). The right does not have to be defined so precisely that the exact action the officer engaged in has been held unlawful, but it must be "apparent" to the officer that pre-existing law forbad his conduct. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). "The burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (citation and internal quotation marks omitted). Although at one time courts were required to follow these steps sequentially, the Supreme Court has abandoned that position and now permits courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

In examining whether the law was clearly established, each of Smith's excessive force claims needs to be examined against that standard. This type of analysis is required by the Supreme Court's instruction "not to define clearly established law at a high level of generality."

10

*Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011)).

The question, then, is defined as whether an intoxicated, non-resistant (or even passively resistant) arrestee who was offered no warning about being tased had a clearly established right not to be tased. *See Cockrell*, 468 F. App'x at 495. *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010), answers that question affirmatively: as of October 2006, "[e]ven without the precise knowledge that the use of the Taser would be a violation of a constitutional right [the officer] should have known based on analogous cases that his actions were unreasonable." *Id.* (quoting *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008)) (internal quotation marks omitted). Moreover, "[t]he diminished capacity of an *unarmed* detainee must be taken into account when assessing the amount of force exerted." *Foos v. City of Delaware*, 2012 WL, at *7 (6th Cir. July 16, 2012) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004)).

As to Smith's second claim, that Baker and Wilson slammed the cruiser door on his leg and ankle causing a broken bone, the Court finds that Smith had a clearly established right to be free from such force. This finding is based on the general principle that a party has a right to be free from excessive force during an arrest. *See, e.g., Adams v. Metiva*, 31 F.3d 375, 386-87 (6th Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 392-93 (1989)); *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). That is, "'obvious cruelty inherent in a practice' can contribute to the conclusion that an act was so aberrant that every reasonable official would have understood it was unconstitutional." *Cockrell*, 468 F. App'x at 494 (citing and quoting *Hope v. Pelzer*, 536 U.S. 730, 741-46 (2002)). Accordingly, the critical question now becomes whether Smith has

11

presented adequate evidence for the Court to find that there are proper factual disputes about the two types of force used by Baker and/or Wilson.  The Court finds that Smith has met this burden.

Excessive force claims against free persons that occur during arrest or seizure are analyzed under the Fourth Amendment's reasonableness standard.  *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (citing *Graham v. Conner*, 490 U.S. 386, 395 (1989)).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.  The facts and circumstances of each particular case deserve careful attention, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  Finally, whether the force used is reasonable is an objective question "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 397-98.  Courts do this to allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 397.

Baker performed a traffic stop on Smith because of suspicion that Smith was operating his vehicle while under the influence.  This suspicion was based on a dispatch that indicated "several" reports had been received describing Smith driving slowly and swerving. [R. 66-13 at 6.]  Baker's hand-written citation also appears to indicate that he personally observed Smith driving slowly and occupying both lanes of traffic. [*Id*. at 6, 18.]  Further, Baker testified that he

12

smelled alcohol once he confronted Smith, and he saw Smith had red, bloodshot eyes. [R. 66-1 at 5.]  The citation eventually issued to Smith contained multiple charges, including operating under the influence, reckless driving, possessing an open alcohol container in the vehicle, resisting arrest, and criminal mischief. [R. 66-13 at 6-7.][2]

Following the stop, Smith complied with Baker's request to get out of the car, and he walked back to Baker's cruiser. [R. 66-1 at 5.]  Evidence substantiates that a Taser was used on Smith at least once and that physical force was used by the officers to position Smith's body in the officers' desired location. [R. 66-13 at 20.]  Apart from that evidence, the facts of this interaction are convoluted.

With regard to Smith's claim over the use of the Taser, Smith's story of getting tased contradicts Baker's and Wilson's accounts.  Smith said Baker was giving him an alcohol breath test when "one word led to another, and before I could turn around he had tased me." [R. 69 at 36.]  Smith fell into the road after being tased by Baker, and as he laid in the road, Wilson approached. [*Id.*]  Smith stated that Baker told him to get in the cruiser or he would be tased by Wilson. [*Id.*]  Smith was unable to comply, and Wilson tased him. [R. 69 at 36-37.]

---

[2] To the extent that Smith asserts a claim for unreasonable seizure in violation of the Fourth Amendment, that claim is baseless. [R. 108 at 8; R. 93 at 12.]   Unreasonable seizure is the result of an arrest that is made in spite of the lack of probable cause. *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008).  Smith bears the burden for proving that probable cause was lacking. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999).  Probable cause is determined by "whether, at the time of the arrest, the 'facts and circumstances within [the arresting officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual either had committed or was committing an offense." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (first alteration in original)).  Here, probable cause is obviously present due to, if nothing else, Baker's personal observations.

Baker's Physical Force Report explained that Smith refused to "let officers restrain him. After several attempts to physically restrain Smith[,] officers backed off and advised Smith if he did not comply that he would be tased.  After several warnings[,] officers appl[ied] a drive stun to the small of Smith's back and were able to get him out of the road." [R. 66-13 at 20-21.] Baker was unsure whether he or Wilson tased Smith. [R. 70 at 65-66.]  Baker was also uncertain how many times Smith was tased. [*Id.* at 65.]

Wilson, meanwhile, contends that Smith was warned about possible tasing: "Told him if he did not get up out of the road that he would be tased." [R. 68 at 8.]  Wilson claims that his Taser was used on Smith, that he removed the cartridge so the drive stun could be applied, and that he actually tased Smith. [R. 68 at 10-11.]

The Court, then, is left with a factual dispute over why Smith was tased, how many times he was tased, and whether he was warned before the Taser was used.  "When the legal question is completely dependent upon which view of the facts is accepted by the jury, the District Court cannot grant a defendant police officer immunity from a[n] [unreasonable] force claim." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (internal quotation marks omitted); *see also Zar v. Payne*, 760 F. Supp. 2d 779, 791 (6th Cir. 2011) (citing *Sova*).  "This is especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment." *Sova*, 142 F.3d at 903.

In adopting Smith's answers to those vitally important questions, it is clear that the force used was unreasonable: "Absent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of [a Taser] on a non-resistant person is unreasonable. *Kijowski*, 372 F. App'x at 600.  Smith was non-resistant and the harm he

14

posed was minimal, even from the perspective of a reasonable officer suffering under the stresses of this situation.  Qualified immunity on Smith's excessive force claim stemming from his tasing is thus subject to the version of the facts the jury chooses to believe, and summary judgment must be denied.

The same result is achieved for Smith's excessive force claim about his broken leg. Summary judgment is denied because a reasonable jury could use Smith's evidence to infer that Baker and/or Wilson broke his ankle by slamming the cruiser door on it.  Such an action would obviously not be reasonable under the Fourth Amendment.

Smith's evidence consists of the following: (1) he was not having problems with his ankle before he was arrested on April 2, 2010; (2) on April 12, he was diagnosed with a broken ankle at the VA, and on May 27, 2011, a portion of Smith's leg was amputated; (3) Smith claims that Baker and/or Wilson slammed the door of Baker's cruiser on Smith's leg during the arrest; (4) Smith was unable to walk in to the WCDC in order to be booked—either at the time he was rejected or at the time he was accepted [R. 66-1 at 10-11]; (5) On April 3, Verna Halcomb observed Smith in order for his release to be consummated and she saw "two very large swollen ankles" and feet, neither of which was deformed [R. 74 at 45]; (6) Halcomb also noted that Smith might have a broken ankle based on Smith's belief that he possessed that injury [R. 66-14 at 7; *see also* R. 74 at 42]; and (7) the emergency room physician at the VA, Dr. Louis Kroot, was told by Smith that he broke his ankle in the aforementioned manner and Kroot opined that the injury could result from that action [R. 75 at 10].  Weighed against that evidence are records from the EMS and BRMC—both of which indicate that at least a cursory full-body examination was conducted—that neglect to mention any problem with Smith's leg. [R. 66-16 at 2; R. 66-9 at

15

16.]  Further, Baker claims that Smith is incorrect and Smith was never placed in the cruiser. [R. 70 at 20.]  Wilson corroborates that account, explaining that "Smith put one foot in like he was going to get in when [Baker] said yes, you are under arrest, [Smith] decided I guess he passed out or pretended to or whatever and just leaned back on Officer Baker." [R. 68 at 7.]

It is without doubt that Smith's leg was injured.  The cause of that injury is the critical question.  Smith presents a res ipsa loquitur-type argument as the answer: Smith was not injured before being taken into custody by Baker and the WCDC, and he was injured when he was released from custody; consequently, at least one of those parties is responsible for Smith's injuries. [*See* R. 93 at 9.]  Yet, Smith does offer bits of evidence, as outlined above, in support of his case.  And he does identify a particular time at which his injury was allegedly inflicted.  Baker and Wilson's evidence, while failing to offer an alternative theory about how Smith's injury occurred, contradicts Smith's proffered proof.

"Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  If there is an absence of "any significant probative evidence tending to support the complaint," then summary judgment is proper. *Id*. (quoting *First Nat'l Bank of Ariz.*, 391 U.S. at 290)).  The same is true for evidence that is merely "colorable." *Id*. at 249 (quoting *Dombrowski v. Eastland*, 387 U.S. 82 (1967)).  But if there is more than one reasonable conclusion, summary judgment should be denied. *Id*. (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479-80 (1943)).  Otherwise stated, a motion should be denied "if reasonable minds could differ as to the import of the evidence." *Id*. (citing *Wilkerson v. McCarthy*, 336 U.S. 53, 62

16

(1949)).  Ultimately in this case, "the moving parties' submissions [have] not foreclosed the possibility of the existence of certain facts from which 'it would be open to a jury to infer from the circumstances'" that Smith's version of events is what actually took place. *Id*. (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  Accordingly, Baker and Wilson's motion will be denied.

**2.**

Accusations of failure to train were levied against the City of Corbin and Whitley County. [R. 108 at 12-13.]  Smith states Corbin failed to properly train its employees in two ways: it failed to train officers on the proper use of force and it failed to train officers on how to obtain appropriate medical care for injured arrestees. [*See* R. 93 at 19.]  Against Whitley County, Smith contends that it failed to train its agents on proper procedures with regard to procuring medical care for inmates.  Summary judgment is proper in favor of both Defendants.

The inadequacy of law enforcement training "only serves as a basis for § 1983 liability 'where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  In order to prevail on a failure to train claim, "the plaintiff must prove . . . that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992) (internal quotations omitted) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989); *City of Canton*, 489 U.S. at 388); *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  But showing deliberate

17

indifference is difficult.  This "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Lee v. Metro. Gov't of Nashville and Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).

"[T]he court is to examine particular deficiencies in the municipality's training program under the standard addressed above, and not simply 'rubber stamp' a department's training program because it appears lengthy or it appears to cover many topics." *Lee v. Metro. Gov't of Nashville and Davidson Cnty.*, 596 F.Supp.2d 1101, 1124 n.15 (M.D. Tenn. 2009) (citing *City of Canton* and *Ellis*).  But, it is "manifestly *not* the defendants' duty to show . . . training was adequate; it [is] plaintiff['s] burden to show that such training was inadequate." *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 566 (6th Cir. 2011).  In regard to the second factor, the Sixth Circuit has identified two situations in which finding deliberate indifference is appropriate. *Id.* at 1124.  One "is where the city fails to act in response to the repeated complaints of constitutional violations by its officers." *Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003).  The second situation involves "a failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Id.* (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).  This scenario springs directly from the Supreme Court's *City of Canton* decision.  "In *Canton*, we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) (citing *City of Canton*, 489 U.S. at 390 & n.10).  Finally, to determine whether

18

inadequate training was "closely related to" or "actually caused" the ultimate constitutional injury, the following question must be answered affirmatively: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *City of Canton*, 489 U.S. at 391.

As to the first claim against Corbin, the Amended Complaint specified a lack of training "in the correct procedure for making an arrest, securing subdued and handcuffed citizens, [and] for the proper use of handcuffs, pepper spray, and Tasers." [R. 48 at 13.]  In response to that accusation, Corbin presented its training manual on appropriate use of force [R. 66-18] and evidence of Baker's and Wilson's training on the use of a Taser [R. 66-19].  Smith did not respond to this evidence in any way.  He did not explain how the training was inadequate. Moreover, he did not even cite the *City of Canton*, 489 U.S. 378, as the basis for his claim.  It is not the Court's responsibility to support a claim that a party asserts but does not properly pursue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Thus, Corbin has presented evidence that training took place.  Smith has not responded with an explanation of why that training was inadequate. *See Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324).  Per the mechanics of summary judgment, Smith's claim fails and Corbin's motion is granted.  Furthermore, it should be noted that Smith's ends-focused analysis—Smith was purportedly injured by Baker and/or Wilson so there must be a lack of training—is improper:

> [T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.  It may be, for example, that an otherwise sound program has occasionally been negligently administered.

19

*City of Canton*, 489 U.S. at 390-91 (internal citations omitted).  The appropriate measure of the adequacy of a training program is if officers are enabled to "respond properly to the usual and recurring situations with which they must deal." *Id.* at 391.  For all of those reasons, summary judgment will be granted to Corbin.

Corbin will also be granted summary judgment on Smith's failure to train claim regarding provision of medical treatment.  The problems with the foundation for this claim are legion, beginning with Smith's scant and scattered justification for it. [*See* R. 93 at 9, 16.]

Apart from that issue, the problem is that medical care was provided to Smith.  After the initial arrest, during which Smith's ankle was allegedly broken, Baker called the EMS to assist him.  The EMS responded and transported Smith to the hospital, where additional examination was conducted.  Whether the EMS and/or hospital provided adequate care is not at issue—Baker ensured that medical care was provided.  Hence, there was no constitutional injury and a cognizable *City of Canton* claim has not been asserted. *See Harbin v. City of Detroit*, 147 F. App'x 566, 572-73 (6th Cir. 2005) ("[A] municipality's failure to train may be the moving force behind a resulting injury but cannot be an injury in and of itself.").

After the WCDC refused to accept Smith, Baker took custody of him again.  What Baker did with Smith is contested, and it seems that Smith may desire to base a failure to train claim on Baker's alleged refusal to return Smith to BRMC, choosing instead to simply park his cruiser and wait. [R. 94 at 5.]  The lack of a constitutional injury arises under this scenario too.  There is no accusation that excessive force was used during this time.  And Smith has not offered even the barest of explanations for how this delay constitutes deliberate indifference to a serious medical need. [R. 93 at 16]; *see Vaughn v. City of Lebanon*, 18 F. App'x 252, 272-74 (6th Cir. 2001)

20

(explaining the basis for a deliberate indifference to a serious medical need claim).  Thus, even if Corbin did not train its police officers, until that lack of training causes an constitutional injury, a § 1983 claim does not exist.  Summary judgment will be granted for Corbin.

With regard to the claim against Whitley County, Smith alleges that it failed to "develop policy, train personnel, enforce existing policy, and to take preventative and remedial measures to guard against the failure to procure necessary medical treatment by its deputies." [R. 48 at 16-17.]  Smith's focus with this claim is on his injury, and it is misplaced.  Smith's injury does not compel the Court to deny summary judgment if the legal requirements for a claim are not met.

Claims have elements.  The elements must be satisfied for the claim to proceed. Defendants grasp this concept and cite law and facts to support their argument.  Plaintiff does not.  Although Smith's circumstances are unfortunate, the breaking and amputation of Smith's leg does not per se mean that Whitley County (or Corbin or anyone else) violated § 1983 or any other law.

For instance, Smith claims that Mobley—who had no personal involvement in this matter—and Halcomb *followed* the WCDC policies. [R. 94 at 9 ("The record establishes that according to Verna Halcomb and Ken Mobley the employees of the jail followed the policies of Whitley County.").]  One of those policies was to have Halcomb examine Smith before he was released on bond, which she did. [*Id.*]  Halcomb explained that her nurse's training provided indicators to help ascertain when a patient had a broken bone. [R. 74 at 12.]  She examined Smith according to those indicators and concluded that she was unsure about Smith's ankle. [*Id.* at 11.]  Halcomb noted that Smith was in bad shape. [*Id.*]  She also explained that the policy for handling someone who complained of a broken leg would be to send that person to the

21

emergency room [*Id.*] or a mobile x-ray machine would be ordered and delivered to the WCDC [*Id.* at 12]. In this case, neither of those steps were taken because Smith was being released so another party could transport him to the VA. [*Id.* at 11.] Halcomb was under the impression that once her examination was concluded, Smith would be released. [*Id.* at 13.]

Over thirty hours later, Smith was released. [R. 99 at 4.] This delay was due to an inability to contact Smith's daughter and another friend who Smith stated would retrieve him from the WCDC. [*Id.*] Another friend ended up picking Smith up from the WCDC, and several days later Smith visited the VA. Obviously that did not go according to the plan with which Halcomb was familiar. But this does not give any credence to a claim that Whitley County had not trained Halcomb on how she should respond to a patient with a broken ankle, as Smith alleges. [R. 94 at 11.] Perhaps this delay indicates that a plan for such a contingency had not been designed and conveyed to certain WCDC officials. But assuming that is true, Smith must prove the second element in a *City of Canton* claim—deliberate indifference.

"[R]epeated complaints of constitutional violations" have not been alleged, *Cherrington*, 344 F.3d at 646, and the first method of finding deliberate indifference is negated. The second method of showing deliberate indifference is "by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409, (1997) (citing *City of Canton*, 489 U.S. at 390 & n.10); *see also City of Canton*, 489 U.S. at 390 ("But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately

indifferent to the need.").  The Supreme Court in *Canton* used the example of police officers arresting fleeing felons to illustrate an obvious situation on which training must be offered. *City of Canton*, 489 U.S. at 390 n.10.  No evidence has been filed explaining why this type of situation occurs frequently enough that it presents an obvious potential for a detainee's constitutional rights to be violated.  Moreover, it appears obvious that Whitley County had procedures for releasing a detainee, as shown by Halcomb being summoned to the WCDC before Smith's release so she could fill out a "transfer paper."[3] [R. 74 at 41; R. 66-14 at 7.]

Smith is fighting a battle in which his position has already been defeated.  An accident is not necessarily indicative of a failure to train.  As the Supreme Court stated in *City of Canton*, a party cannot prevail simply by showing "that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton*, 489 U.S. at 391.  For the above reasons, summary judgment will be granted in favor Whitley County.

### 3.

Smith also levied charges of deliberate indifference to his serious medical needs against Baker, Wilson, [R. 108 at 10] and Whitley County [*Id*. at 14].  Summary judgment will be granted for all Defendants.

Smith's claim is founded on the Fourteenth Amendment, which guarantees pretrial detainees analogous rights to medical care as those guaranteed to prisoners under the Eighth

---

[3] The preceding discussion did not even mention the procedures the WCDC had for accepting arrestees.  As Smith's situation shows, the WCDC had a procedure for accepting a detainee who had been hospitalized. [R. 66-9 at 7.]  The WCDC also had as a part of its booking procedure a form each inmate helped fill out that described ongoing medical issues.  It is worth reiterating that Smith filled out this form and did not indicate that he was having a problem with

Amendment. *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003). "Where prison [or jail] officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment . . . ." *Vaughn v. City of Lebanon*, 18 F. App'x 252, 272 (6th Cir. 2001) (quoting another source). A detainee claiming deliberate indifference must show that she had "an objectively substantial risk of serious harm" and that the "official was subjectively aware of the risk." *Harbin v. City of Detroit*, 147 F. App'x 566, 570 (6th Cir. 2005) (citations omitted). Objective medical needs are those "so patent as to make lay persons . . . remiss in failing to arrange for immediate medical attention." *Vaughn*, 18 F. App'x at 275 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). Subjective awareness is proven by showing that an official has a culpable state of mind. *Id.* The official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The overarching idea is that "no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment." *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988).

Though these facts have already been presented, rehashing them identifies why Smith has failed to bear the burden he must to persist past summary judgment. Baker provides evidence that he called the EMS after arresting Smith. The EMS examined Smith and transported him to the hospital. Wilson's involvement with Smith ended at that point. Smith was examined at BRMC and released into Baker's custody. Nothing in the hospital release indicates that Smith

---

his ankle or leg. [R. 66-14 at 12-13.]

was suffering a leg injury.  Baker took Smith to the WCDC and his attempt at booking him there

failed.  Using facts most favorable to Smith, Baker proceeded to drive Smith away from the

WCDC and return without seeking additional medical care.  At that point, the WCDC accepted

Smith as an inmate.  Smith proceeded to help fill out a medical intake form which asked whether

he had any medical problems.  Several problems were listed, but none pertained to a leg injury.

Thus, Smith had at least three opportunities to complain to parties other than Baker that he had a

leg injury.  Smith did not use any of them.

Smith's only useful retort against Baker's evidence is that Baker was present when Smith

was unable to walk into the WCDC during the failed booking attempt and he did not transport

Smith back to the hospital.  Looking at that evidence in Smith's favor, it establishes that Baker

was aware that Smith was unable to walk; at the same time he possessed knowledge that Smith

had been treated by two different medical providers, each providing no indication that Smith had

an injured leg.  Smith has expended no effort at explaining why his broken ankle was not

discovered by the EMS or the hospital, and thus it is difficult to conclude that Baker was any

more than negligent in resolving this conflicting evidence in favor of concluding that no serious

harm was present.  Furthermore, even assuming that Baker was subjectively aware, objective

awareness as defined above is still missing.

Smith's broken ankle is a serious injury, and one that has resulted in tragic consequences

for him.  The time at which the seriousness of the injury is examined, it must be noted, is at the

time that Baker and Smith interacted. *Vaughn*, 18 F. App'x at 272-74.  At that time, two groups

of medical professionals examined Smith and did not discover his leg injury.  In fact, the BRMC

discharged Smith with knowledge that he was going to be incarcerated.  Concluding, then, that

25

Baker is at fault for ignoring this injury is wrong.  An injury must be "so patent as to make lay persons . . . remiss in failing to arrange for immediate medical attention." *Vaughn*, 18 F. App'x at 275.  Here, medical providers did not arrange for additional medical testing after seeing Smith at the same time Baker did.  The Court is not convinced that Baker can be faulted for being unaware of an injury that was overlooked by medical providers.

Baker and Wilson have provided substantial evidence in support of their position.  In opposition, then, Smith must "do more than show there is some metaphysical doubt as to the material fact.  [He] must present significant probative evidence in support of [his] opposition to the motion for summary judgment."  *Hall Holding*, 285 F.3d at 424 (internal citations omitted).  Smith has not done that, and summary judgment will be entered for Baker and Wilson.

Smith's claim against Whitley County must meet the elements outlined above in addition to satisfying the standard for municipal liability.  In greater detail, Smith must first show that one of Whitley County's officers was deliberately indifferent to his medical needs.  Then, Smith must show that a policy or custom of Whitley County caused the officer to act in the manner he did.  *Lee v. Metro. Gov't of Nashville and Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011) (citing *Collins*, 503 U.S. at 120)).  Unless both elements are satisfied, judgment must be entered for Whitley County.

Smith again leaves much to be desired in setting out the parameters of his claim. [R. 94 at 11-12.]  He mentions Dave Morrow as an involved party.  But Morrow refused to accept Smith at WCDC because of his injuries and, according to Smith, told Baker he had to take Smith back to the hospital. [R. 67-1 at 32.]  In other words, he responded to a perceived need for Smith to receive additional medical treatment and obviously was not deliberately indifferent.

26

Verna Halcomb is also mentioned in Smith's Response to Whitley County's motion for summary judgment: "Halcomb was right there and saw for herself the egregious injury to plaintiff and well knew the consequences of a failure to treat." [R. 94 at 12.]  Halcomb observed Smith and noted that he was in poor condition, but Halcomb conducted that exam in order that Smith could be released from the WCDC and seek treatment at a hospital.  As with Morrow, she responded to Smith's injury—first by using her medical training to briefly check for a broken bone, and then by signing a medical release form so Smith could be released on bond.

Although Smith's claim is defeated just by the manner in which Morrow and Halcomb responded to Smith, it is further undermined by his inability to identify a custom or policy of WCDC that caused any agent of Whitley County to ignore his medical needs.  There is a total lack of proof for this claim, and accordingly, summary judgment will be granted in Whitley County's favor.

Smith has filed a cross-motion for summary judgment. [R. 78]  Myriad problems plague the motion, including seeking recovery from non-parties, [*see* R. 78 at 1] but the essence of the motion seems to be that summary judgment should be granted in Smith's favor on his deliberate indifference to serious medical needs claim.  Relatedly, Smith moves for the Court to award the costs of the medical treatment provided by the VA. [R. 78.]  As explained above, Smith has failed to rebut Defendants' motions for summary judgment; a fortiori, his motion will be denied in its entirety.[4]

---

[4] Smith filed a motion to supplement his motion for summary judgment. [R. 106.]  The motion only supplements his summary judgment motion by adding information about damage payments and medical bills.  As that issue was not reached because the underlying claim was denied, Smith's supplementary information will not impact his case.  Accordingly, his motion will be denied as moot.

**4.**

Smith's next claim is that Baker, Wilson, and, Corbin are liable for assault and battery. [R. 108 at 18.]  Baker and Wilson affirmatively defend by citing a state statutory provision authorizing the use of force while effectuating an arrest and through the use of qualified immunity.  The Court will deny Baker, Wilson, and Corbin summary judgment on Smith's assault and battery claims.

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001).  Intent is an element that must be proven, but actual damages do not have to be shown by Smith to satisfy the elements of these claims. *Id*.  Smith's description of his encounter with Baker and Wilson clearly evidences that Baker and Wilson touched him intentionally.  Per Smith's version of the facts, this touching included physical force, being tased twice, and having pepper spray used on him.

Section 503.090(1) of the Kentucky Revised Statutes authorizes officials to use force during an arrest provided the officer "(a) believes that such force is necessary to affect the arrest; (b) makes known the purpose of the arrest or believes that it is otherwise known . . . ; and (c) believes the arrest is lawful."[5]  Although an officer is permitted to use force, he "may use such force as may be necessary to make the arrest but no more." *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973).

---

[5] The state statute referred to is a "justification[] in defense of a criminal charges for use of physical force, the same principles apply to Plaintiff's state law claim of civil assault and battery." *Fultz v. Whitaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003).

28

Qualified immunity, meanwhile, is available when public officers are sued in their individual capacities for performing discretionary functions within the scope of their authority. Then, officers are protected from "damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W. 3d 510, 522 (Ky. 2001). Because the evidence shows that Baker and Wilson were performing a discretionary function within their scope of authority, to overcome qualified immunity Smith must show the officers did not act in good faith. *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008) (quoting *Yanero*, 65 S.W.3d at 523.) To prove that Baker and/or Wilson did not act in good faith (i.e. they acted in bad faith), Smith must show

> a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.

*Yanero*, 65 S.W.3d at 523 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Based upon the contact described by Smith and the Court's previous finding that Smith had a viable excessive force claim, Baker and Wilson are not protected by either defense and this claim can proceed.

As to this tort claim against Corbin, "principal-agent and master-servant relationships within the scope of the *respondeat superior* doctrine do exist between a municipal corporation and its officers and employees." *Marksbury v. Elder*, 2011 WL 5598419, at *9 n.9 (E.D. Ky. Nov. 17, 2011) (quoting *City of Lexington v. Yank*, 431 S.W. 2d 892, 895 (Ky. 1968). "Kentucky's highest court repeatedly has held that municipal immunity from liability for 'ordinary torts' exists only in situations involving the exercise of legislative or judicial or quasi-

legislative or quasi-judicial functions." *Ashby v. City of Louisville*, 841 S.W.2d 184, 186 (Ky. Ct. App. 1992) (quoting and citing other sources). The *Ashby* court examined the types of activities that permit a city to assert immunity and concluded that the allegedly tortious actions by police officers in that case were not among the recognized exceptions to municipal liability. *Id.* at 188; *see also Lamar v. Beymer*, 2005 WL 2464178, at *12 (W.D. Ky. October 4, 2005) (holding that a municipality could be liable for the actions of one of its police officers in unnecessarily assaulting an arrestee) (citing *Gray*, 499 S.W. 2d at 74). Thus, summary judgment is denied and Smith's claims may proceed against Baker, Wilson, and Corbin.

**5.**

The next claim is premised on the tort of intentional infliction of emotional distress. Baker, Wilson, Corbin, and Whitley County were named in this claim. [R. 108 at 19.]

A claim for intentional infliction of emotional distress (also known as outrage) consists of four elements: (1) "plaintiff must show that defendant's conduct was intentional or reckless"; (2) "that the conduct was so outrageous and intolerable as to offend generally accepted standards of morality and decency"; (3) "that a causal connection exists between the conduct complained of and the distress suffered"; (4) "and that the resulting emotional distress was severe." *Lewis v. Laurel Cnty. Sheriff's Dept.*, 2011 WL 3475370, at *8 (E.D. Ky. Aug. 8, 2011) (quoting *Banks v. Fritsch*, 39 S.W.3d 474, 480-81 (Ky. Ct. App. 2001). This tort is only cognizable in two instances because Kentucky law has identified it as a "gap-filler" tort. An outrage claim is available if "a more traditional tort cannot provide redress for the alleged conduct." *Green v. Floyd Cnty.*, 2011 WL 978148, at *2 (E.D. Ky. Mar. 17, 2011). That is clearly not the case here as the torts of assault and battery have already been recognized, and emotional distress damages

are available in conjunction with those claims. *See Gibson v. Slone*, 2011 WL 2009815, at *3 (E.D. Ky. May 23, 2011); *Grace v. Armstrong Coal Co.*, 2009 WL 366239, at *3 (W.D. Ky. Feb. 13, 2009) (and cases cited therein).

An outrage claim can also be recognized if "the defendant[] solely intended to cause extreme emotional distress." *Green*, 2011 WL 978148, at *2. Smith has not pursued that line of argument, and the facts as presented do not substantiate that Baker and Wilson intended such a result. Consequently, as to Baker, Wilson, and Corbin, summary judgment will be granted.

Whitley County will be granted the same result. "Kentucky counties are cloaked with sovereign immunity under Kentucky law by virtue of their status as an arm or political subdivision of the Commonwealth." *Crawford v. Lexington-Fayette Urban County Government*, 2007 WL 101862, at *1 (E.D. Ky. January 10, 2007) (quoting and citing other sources) (internal quotation marks omitted). Because this claim is premised on Kentucky law, "state rules of immunity govern." *Id.* at *3 (quoting *Benning v. Board of Regents*, 928 F.2d 775 (7th Cir. 1991)). Furthermore, Kentucky counties' sovereign immunity is only waived by decision of the Kentucky General Assembly, not by court decree. *Id.* (quoting and citing other sources). Smith has not cited any law which abrogates Whitley County's sovereign immunity for intentional infliction of emotional distress claims. Moreover, case law supports that such a law does not exist. *See Wardle v. Lexington-Fayette Urban County Government*, 2006 WL 2788951, at *4 (Ky. Ct. App. Sept. 29, 2006). Accordingly, this claim as against Whitley County is barred by Kentucky law.

31

**6.**

Smith's final claim is that Baker and Wilson were negligent. [R. 108 at 19.]  Smith provides no additional argumentation about this claim. The Sixth Circuit has explained how a court should proceed in the face of such a situation: "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (alterations in original) (quoting another source).  The Court, therefore, will enter judgment for Baker and Wilson on this claim.

**III.**

Smith asserts six claims against various defendants.  Summary judgment is denied to Baker and Wilson for the excessive force claim.  In contrast, Corbin and Whitley County are granted summary judgment as to Smith's failure to train claim.  Deliberate indifference to serious medical needs was not shown by Baker, Wilson, or Whitley County and judgment is granted in their favor, and Smith's motion on that claim is denied.  Judgment is also denied to Baker, Wilson, and Corbin on Smith's assault and battery claims.  Judgment, however, is granted in favor of Baker, Wilson, Corbin, and Whitley County for Smith's intentional infliction of emotional distress claim.  Finally, Smith's negligence claim fails and Baker and Wilson are granted summary judgment.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

(1)    Whitley County's Motion for Summary Judgment [R. 67] is **GRANTED**;

32

(2)      Baker, Wilson, and Corbin's Motion for Summary Judgment [R. 66] is

**GRANTED** in part and **DENIED** in part in accordance with the preceding paragraph;

(3)      Smith's Motion for Summary Judgment [R. 78] is **DENIED**;

(4)      Whitley County and Mobley's Motion to File Supplement [R. 103] is **DENIED** as

moot;

(5)      Smith's Motion to Supplement [R. 106] is **DENIED** as moot;

(6)      Whitley County and Mobley's Motion to Dismiss [R. 111] is **DENIED** as moot;

(7)      This is a **FINAL** and **APPEALABLE ORDER** and there is no just cause for

delay;[6] and

(8)      The dates for the Final Pretrial Conference and Jury Trial remain as scheduled;

and

(9)      The Court will enter an appropriate judgment contemporaneously herewith.

This 10th day of January, 2013.



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**

---

[6] The Court finds that this partial grant of summary judgment should be immediately appealable for two reasons. *See Akers v. Alvey*, 338 F.3d 491, 495 (6th Cir. 2003); *Bonner v. Perry*, 564 F.3d 424, 427 (6th Cir. 2009). First, the adjudicated and unadjudicated claims have a close relationship: they arise from the same facts, involve the same counsel, and would undoubtedly be dependent on similar evidence. Furthermore, to delay an appeal could obligate the Court to consider the same issues two different times, harming judicial efficiency. Moreover, no obvious factors weigh in favor of delaying the parties from appealing this decision, were they so inclined.